## THE WEBER BROS. AND THIRTEEN OTHER CANAL BOATS.

(District Court, E. D. New York. June 20, 1898.)

SALVAGE—TOWAGE COMPENSATION.

 A tug which rendered some aid in drawing a fleet of canal boats into a safe harbor, after they had been rescued from all serious danger by other tugs, *held* not entitled to a salvage award, but merely to a compensation of $100 for towage.

This was a libel in rem by Mary T. Millen against the canal boats Weber Bros., Peter A. Weber, R. T. Hedden, Lottie A. Collins, D. Johnson, Mrs. Mary Monks, John Monks, Willie J. Clark, Augustus Swan, John T. Dunbar, Albert Atwood, David Taylor, Ard McCormack, and their cargoes, to recover compensation for alleged salvage services.

Peter S. Carter, for libelant.

Carpenter & Mosher, for all boats except the Peter A. Weber and the Weber Bros.

James J. Macklin, for the Peter A. Weber and the Weber Bros.

THOMAS, District Judge.   The libelant brings the present action for salvage services alleged to have been rendered the boats of the claimants in the Hudson river, on the 28th day of August, 1893. During the night of the 27th of August a storm of great, and, on that river, unprecedented, violence arose, which continued unabated until the afternoon of the 28th.   The tug Hudson, owned by the libelant, was lying at Rockland Lake landing, when the canal boats libeled herein, and other canal boats, were towed down the river past such point by certain tugs, to wit, the tugs Pocohontas, Komuk, and Victoria.   The tow proceeded safely until opposite Irvington, when the sinking of one of the boats caused the tow to break up.   Thereupon, after considerable difficulty, a portion of the tow proceeded down the river in charge of the Pocohontas.   The tugs Komuk and Victoria undertook to secure control of the remaining fragment of the tow, consisting of the boats libeled herein, laden with grain, and partially succeeded in doing so.   The tow was conducted with great difficulty, and amidst great peril to the boats and those in charge thereof, to a point some two miles south of the Rockland Lake landing.   At about that point a signal of distress was sent out by one of the tugs, and although the tug Hudson was lying at Rockland Lake landing, and in sight of the distressed boats, she preferred the security of her place of refuge, and did not respond to the signal. However, the tug Terror did so respond, and rendered aid to the tow. The Terror fastened to the stern of the tow, somewhat on the starboard side, and the tug Komuk did the same on the port side, and in these positions pulled the tow up the stream; while the Victoria, running a line from her stern to the bow of the tow, drew in a direction contrary to that of the Komuk and the Terror, so as to keep the boats apart, and prevent them from pounding against and injuring each other.   There were four tiers of boats.   In the front tier were the boats owned by or in charge of Weber.   In the second tier were three boats, and in each of the fourth and fifth tiers were four boats.   At this time the tow was in the center of the channel or somewhat eastward thereof.   The tide was flood and the wind blowing with considerable velocity.   The libelant's witnesses place the wind slightly west of south, while the claimant's witnesses give it a slightly southeasterly course.   It was blowing substantially from the south, which would carry the tug directly up the river.   The tow, in charge of the tugs as above stated, was drawn northwesterly in the direction of Rockland Lake landing, and, according to the evidence of the claimant's witnesses, passed the dock at a distance in the river of from 500 to 800 feet, to a point where the bow of the tow was somewhat above or northerly from the dock; whereupon the Komuk and Terror left their positions at the stern of the tow, and secured lines to the bow thereof, the Victoria having disconnected her lines, as her rudder was somewhat impaired, and it is claimed that her services were no longer necessary.   The claimants contend that the intention was to draw the tow into the harbor at Rockland Lake landing.   At about this juncture, but before the tugs changed their position, the Hudson, as the claimants contend, came

out from the dock, went in front of the Victoria, around to the port side and stern of the tow, and offered her aid to the Terror; that the captain of the Victoria, temporarily on the Komuk, and in charge of the entire tow, called out to the captain of the Terror not to take the line; that the captain of the Terror directed his deck hand not to take the line, and that it was accordingly refused. The captain of the Hudson admits that the Terror declined the line, but states that the reason given him was that it might cause the Terror's hawser to part, and that a suggestion was made by some one that the Hudson should connect directly with the tow. In any case, it is agreed that the Hudson did offer her aid to the Weber boats, in the front tier of the tow, and that this offer was declined by some person in immediate charge of the two canal boats in such tier. The captain of the Hudson states that it was declined for the same reason and with the same suggestion made by some one on the Terror. Again, the Hudson, her line having been refused by the second tier of boats, dropped back and threw her line to the Collins, in the third tier. No one testifying for the claimant knows, as they testify, how the Hudson made her attachment to the Collins. However, some of them state that the first line thrown to the Hudson was not taken by persons on the Collins, and was allowed to fall back into the water. The captain of the Hudson states that his line was taken and made fast by those on the Collins, and he is corroborated in this by the captain of the Collins. The fact seems to be uncontradicted that thereupon the Hudson assisted to haul the boats to the Rockland Lake landing, and to secure them in the refuge there provided. Several persons in charge of the canal boats, and the captains of the towing tugs, all unite in a substantially similar statement as to the position of the tugs and tow when the Hudson came up. They assert that the water was at that point not violent, as was the case further out in the stream; that the boats were in no danger whatever; that the tugs in charge could have landed them without difficulty; that the perils had been passed, and the harbor of refuge all but made, when the Hudson came out; and that the entire service of the Hudson did not continue for more than half an hour.

The captain of the Hudson, confirmed somewhat by other witnesses, gives quite another and different account. He says that when he went out the tow was a mile or a mile and a quarter to the east of the dock; that her tugs were fastened to the bow, but were so impotent to hold the tow that it was drifting sternways towards Teller's Point, on the east side of the river. Teller's Point is not directly east from Rockland Lake landing, but northeasterly thereof, and about northerly of the center of the river opposite Rockland Lake landing, and about a mile and a half from that point. The river opposite Rockland Lake landing is some 2¼ miles in width. The libelant's evidence also tends to show that the river was very much disturbed; that the water was dashing over the boats; that they were unmanageable, and in danger of parting their lines, separating, and being carried to and wrecked on the rocky shore; and that the Hudson's aid, continuing something like 1½ hours, prevented such catastrophe.

The question is whether the boats were in any danger when the Hudson appeared, whether her proffered aid was declined, and whether it was necessary.

In any case, before reaching Rockland Lake landing, going sternways, the boats had been in extreme danger for many hours; also boats in the same locality had been separated from their tow, and several of them dashed to pieces, and sunk or washed upon the shore. The boats in question had narrowly escaped destruction, and when making for Rockland Lake landing, if they were not in, yet they were in close conjunction to, a danger that had for many hours beset them; and those on board of the canal boats, suffering from exposure, had barely escaped, even if they had then escaped, from a continuing menace to their lives. The alleged indifference of those on the tugs and boats, amounting almost to serenity, as stated by them severally on the witness stand, when the Hudson appeared, comports illy with the very great and just sense of peril that seems theretofore to have pursued these men, in what was on both sides admitted to be the most destructive storm that had ever come over the river; and yet the abundance of the evidence offered by the claimants, the apparent candor and intelligence of several of their witnesses, render improbable the evidence of the libelant's witnesses as to the dire peril of the crew at the very time when the Hudson went to render aid. The tow had been taken for some miles up the river, and had been kept off the shore. It is true that full control of the tow would have been necessary to have taken it around Teller's Point. had it drifted so far northerly; but it is incredible that so many persons, of apparently respectable character, should have disclaimed so strongly and deliberately against the continuance of the full dangers that attended them, if in fact they had been in peril of being swept by the tempest and tide upon the rock.

The burden of proof upon the libelant has not been sufficiently maintained to impress the court with the truth of his contention that he delivered these boats from great peril. They had probably escaped the physical dangers, but those in charge were probably in such condition that they were not unwilling to receive the assistance extended to them by the Hudson. This the evidence fairly shows. It is suggested by some of the parties interested that the act of the Hudson was regarded as a mere courtesy, such as is frequently extended by tugs to tows, and that it was not expected that a salvage service was intended. The captain in general charge of the tow stated that he understood that the Hudson was offering a service for which a charge would be made. However that may be, the service was rendered, and, if not received with eagerness, it was not repelled as absolutely unwelcome. The libelant has the legal right to be paid in money rather than by a reciprocity of courtesies. The question is, what should that payment be? It cannot be said that the Hudson saved the boats, but it gave a helping hand to those who had then reached, and only barely reached, in weariness and distress, a place of safety. While compensation for salvage service, as such, cannot be allowed, yet something in the nature of compensation for towage should be paid, in justice to the libelant. The sum of $100

is the full, if not beyond the full, limit of just compensation for the services. For such sum and costs let a decree be entered in favor of the libelant. If any question shall arise as to the share of the decree that the vessels should respectively bear, the matter may be pre-. sented to the court for settlement.